Planned Parenthood of the St. Louis Region, et al. v. Michael L. Parson, et al. Thank you, Your Honor, and may it please the Court, John Sauer appearing on behalf of the State of Missouri. People with Down Syndrome contribute unique joy, beauty, and diversity to our society. They add happiness wherever they go, to themselves, to their families, to their communities, and to society as a whole. They make us better people. And empirical evidence from the surveys that are in the record in this case verify those intuitions. Their elimination of the class of, or the radical reduction in the numbers of the class of people with Down Syndrome would inflict an incalculable loss on our society. And yet, in many Western nations, people with Down Syndrome are literally one generation away from virtually complete elimination. And the United States and the State of Missouri are not far behind. The rates of abortion of children with Down Syndrome are as high as 67%, maybe as high as 93% based on a range of surveys that are in the record in this particular case. That epidemic of abortions targeting children with Down Syndrome for elimination, solely because of their disability, not for any other reason, solely because of their disability, is a crisis. And in response to that crisis, the Missouri Legislature passed a narrowly tailored provision, section 188.038, subpart 2, that prohibits any medical provider from performing or inducing an abortion if they have actual knowledge, so it requires actual knowledge, actual knowledge that the abortion is being sought, quote, solely because of Down Syndrome. So the provision is calculated to impose the least possible restriction on the liberty to receive an abortion consistent with Missouri's compelling interest in preventing and putting a stop to this epidemic of abortions that are targeted for Down Syndrome. The right that's asserted by the plaintiffs in this case, the right to target a disabled person for abortion solely because of their disability, is not a right that is deeply rooted in America's history and traditions. It is not implicit in the concept of ordered liberty. The overwhelming evidence of this case demonstrates that our society over the last three and a half decades has decisively repudiated the shameful history of medicalized discrimination against persons with Down Syndrome that was a blight on a long number of decades in the 1980s, as recently as 1982, for example, our expert pointed out that the treating physician in the infamous Baby Doe case in Indiana described children with Down Syndrome as, quote, mere blobs. If I understand this particular provision, it applies both pre-viability and post-viability, correct? It does, Your Honor. So at least as to the pre-viability time period, how can that square with the United States Supreme Court president, Roe, Casey, that reaffirms that right pre-viability? Yes, Your Honor. We've offered eight reasons in our opening brief why Roe and Casey are not controlling, particularly when it comes to the Down Syndrome provision. I would just like to highlight a few of them for the court right now. First of all, neither Roe nor Casey addressed anything like an anti-discrimination provision, anything similar to the Down Syndrome provision that's in this case. And actually, as Justice Thomas recently pointed out, the petition, the respondents in Casey, affirmatively decided not to challenge the sex-selective abortion ban that was already on the books in Pennsylvania in that case. So in Casey, there was a considered decision by the litigants not to raise a challenge to the anti-discrimination provision that was already on the books in Pennsylvania. So the argument that Roe and Casey somehow pre-decided this issue when the litigants had expressly decided not to raise this issue, I'd actually direct the court's attention to Judge Easterbrook's opinion in the Peeping case, where he pointed out that, quote, judicial opinions are not statutes. They don't decide everything, situations that aren't presented for decision in that particular case. And Casey obviously had literally nothing to do with an anti-discrimination provision. And in fact, Casey was decided right around the time when societal attitudes towards persons with disabilities, including persons with Down Syndrome, were undergoing this radical shift from the late 1980s, which was still an era of heavily medicalized discrimination, to the passage of the Americans with Disabilities Act in the early 1990s. None of those issues were even thought about or considered by the parties of the court in the Casey decision. And that's why Justice Thomas, I think, said very aptly, whatever one thinks of Casey, Casey did not decide whether or not a state may prohibit abortion for a discriminatory reason. I'd actually quote to the court also footnote eight of the respondent's brief  had nothing to do with a pre-viability abortion ban like the Down Syndrome provision and, quote, addressed regulations that are, quote, entirely dissimilar to the Down Syndrome provision. So it's puzzling how they can argue at the same time that Casey didn't address anything like this and yet is binding on that particular issue. Can I ask a preliminary question, though, even before we get to this? Third-party standing, all of this was briefed before June medical, and I want to figure out what's in the case still and what's outside the case. Is Missouri still pressing the third-party standing argument, or can we do away with that for purposes of this appeal? We don't concede third-party standing because there was no sufficient factual record made to establish third-party standing. I do not read June medical as saying that you have no burden to submit any facts to support third-party standing. But I would emphasize more than that, Your Honor, that we have a separate and distinct argument that there is no statutory cause of action under Section 1983. That's a completely different argument. I agree. Statutory standing is different, and it gets conflated again and again in these cases, including in the Van Hollen decision from the Seventh Circuit. Here's the plain language of Section 1983. Every person who subjects any citizen of the United States or other person to a deprivation of federal rights, quote, shall be liable to the party injured, not to some third party, liable to the party injured in an action at law, a suit in equity, or another proper proceeding. And this court said in Advantage Media, again in Clark against Garrick, very clearly that you can't assert a Section 1983 action to assert some other person's rights. If you go to paragraphs 80, 82, 84, and 86 of the complaint in this case, they make it very clear they are only seeking to assert the rights of third parties, in fact, hypothetical third parties or unidentified future patients. So under the plain language of Section 1983, under this court's case law, under the case law of at least four other circuits that we've cited, it's just really well established, clear as day, black letter law, that there is not a third party cause of action under Section 1983. They've made two arguments in response to this, Your Honor. The first argument is that, well, those are all suits for money damages, not suits for equitable relief. That argument, I submit, founders on the plain language that I just read of Section 1983, liable to the party injured. Counsel, I wanted to ask you, I'm going to go back. That was sort of a preliminary question, but I wanted to go back to the merits, which is I find it odd. This is a legislative judgment, but was there any consideration given in the legislation as to other disabilities? So this is a disability discrimination provision, but there's other disabilities. One that immediately comes to mind is Tay-Sachs syndrome, which affects young children in a horrible way. Were any of those things considered? I mean, I'm just curious. Why just Down syndrome? I'm not aware of anything in the legislative record that would address that, and Missouri, in fact, has very limited legislative history as Missouri appellate decisions will advise the court. There's nothing in the legislative record in that, but there's a whole series of cases. They haven't argued that this is under-inclusive because we should have targeted, you know, we should have protected other disabilities. I'd say two things in response to that. One is I'm not aware of anything like the evidence we have of those classes of disabled persons being on the brink of complete elimination, like the evidence we have in this case. I'd point the court to Justice Thomas' separate opinion in Vox, where he emphasized, for example, the abortion rates of Down syndrome children in Iceland and, you know, in Denmark and nations like that, South Korea, where even France, the United Kingdom, approaches 90%, and the evidence that we have in the United States is that we're somewhere in the range of 67% to 93%. So I'm not aware of any evidence about that. And I'd also emphasize a legal point. There's a long series of cases that rejects this kind of under-inclusion argument in situations where there's... the state has a really compelling interest to say, well, your interest isn't obviously compelling enough because you didn't address all these other problems. There's a lot of cases saying the state can, you know, address... take the problems one at a time and address one. There's every reason to think the Missouri legislature could look at this really compelling problem and say, this needs to be addressed right away. Legally, I don't think the analysis before the court would be different. If additional disabilities were protected, as Indiana's statute in the P-Pain case did protect those, Ohio's statute does as well. In this particular case, Missouri has made a legislative judgment that the crisis when it comes to Down syndrome is a critical crisis. It needs to be addressed. It has addressed that in a narrowly tailored way. In returning to Judge Kelly's question, if I may, I'd also like to emphasize, Your Honor, I pointed the court to the fact that Casey and Roe did not directly address or even consider anything like an anti-discrimination provision. But I'd also like to emphasize, if you actually look at the plain language of those two decisions, both of them strongly indicate that this is an acceptable legislative choice, starting with Roe v. Wade itself. And Roe v. Wade, the Supreme Court, the opinion of the court expressly said that we have considered the argument that a woman's right to abortion is absolute and she can have it at any time and, quote, for whatever reason she desires. And it goes on to say, quote, with this we do not agree. And, of course, that's exactly the liberty interest that's being asserted in this case. They say that in almost so many words in their briefs, that we are asserting an interest that you cannot, prior to viability, you could never limit a reason for having an abortion. Directly contradicts the plain language of Roe v. Wade. In addition to that, Casey, they emphasize in Casey the language that says you cannot deprive the woman of, quote, the ultimate decision to have an abortion pre-viability. And they quote the word prohibition. That appears in the Casey opinion. But consider the analogous context of an anti-discrimination provision that would apply in the employment context. No one would say, for example, that, well, we ban employment discrimination on the basis of race that we're depriving employers of the ultimate decision of whom to hire. We're just saying you can't do it on that one discriminatory basis. But we still have the pre-viability, at least from the Supreme Court as it stands right now, the right to a pre-viability abortion without a substantial obstacle put in the way to that. Why is this not just an insurmountable substantial obstacle for a woman pre-viability? I believe what Casey says, and I think I'm quoting this, is that the state cannot present a substantial obstacle to the woman's decision to bear or beget a child. But it does not say that there's a right to bear or beget a particular child, a child with preferable characteristics. So there's no right that's recognized anywhere in Casey that says you have the right to say, I want this child with this genetic formula, these genetic characteristics, as opposed to... Well, I don't think Casey speaks one way or the other, does it? I mean, it doesn't say... There is only one child that is that issue, one fetus that's at issue. So I'm not sure that that really cuts either way. Yeah, and I would pick up on the first part of what Your Honour just said respectfully and emphasize that. Casey did not address this one way or the other. Their whole argument in this context is that Casey establishes that anti-discrimination provisions are categorically invalid, that they are per se invalid. But as Your Honour just correctly stated, Casey didn't talk about it at all. No, Dennis, what Casey talked about was the right pre-viability. Right, yes. Casey says it addresses the right to abortion pre-viability, but what it does not say is that you have a right to abort for any reason pre-viability. The issue was just not presented in that case and not addressed. Going back to Roe v. Wade, the argument that you have a right to abortion, quote, for whatever reason you desire is... The Supreme Court said, quote,  With this we do not agree. I also want to highlight, we've asserted nine compelling governmental interests in this case that are advanced by the Down syndrome provision, and they haven't really disputed that any of those nine compelling governmental interests is either real or that it's compelling. In a sense, they concede, or at least they don't dispute, that all nine of those interests that we've asserted are compelling. So as long as the per se invalidity rule that they assert is incorrect as we contend, it's hard to see how regardless of what standard of scrutiny the court would apply to this case, this statute remains valid. We've got nine compelling governmental interests. We talk about the beauty and the joy and the diversity that people with Down syndrome add to society. We talk about how there's a compelling interest in protecting a class of disabled persons from being targeted for elimination solely because of their disability. We talk about eradicating the historical, the really shameful... The evidence in this case is astonishing when it gets to the history of medicalized discrimination against persons with Down syndrome. We talk about eradicating historical discrimination, eliminating stigma. Counsel, I'm going to ask you sort of the opposite of what Judge Kelly was, I think, getting at, which is what case allows us to consider these other interests previability? In other words, to say, hey, these other interests are compelling, and the standard changes. We're not talking about substantial obstacle or weighing burdens and benefits, whichever opinion you want to talk about from whole women's health. But we can consider these and kind of look at it, and what is the best support you have for that? I think the best support for that is Gonzalez against Oregon, and here's why. In Gonzalez against Oregon, there was an attempt to ban an entire class of previability abortions, those that are performed using the barbaric partial birth abortion technique. And in that particular case, the Supreme Court didn't say, well, we're not allowed to consider interests. It identified and considered multiple new interests that hadn't yet been asserted or addressed in case. And the one I'd emphasize most is protecting the integrity and public reputation of the medical profession. That was held to be an important governmental interest that justified that particular ban in Gonzalez against Oregon. Ms. Hammerman, you're not muted. In that particular case, what the court held was that that sufficed. In other words, the court looked at that interest, said that interest is a new interest that hasn't been asserted in previous cases, that authorizes, that justifies, it was then the federal government, the government to impose a new restriction on previability abortion, and it subjected that claim to rational basis review, which Chief Justice... But what about, in that case, there was an alternative, right? It wasn't a substantial obstacle because there was an alternative to the partial birth abortion. What is the alternative for the woman who is seeking the previability abortion in this situation? I think what I would say to that is this is not a substantial obstacle to the right to abortion. However, it does prevent women whose doctors know that the sole reason they're having an abortion from obtaining an abortion. So it's only a prohibition if the court looks at the state's interest and says, oh, you're stopping someone. So it's only if the plaintiff is defined so narrowly as a prohibition. And I would return to the analogy to employment discrimination, employment discrimination provisions. Employment discrimination provisions says you cannot say I will only hire white people or I will only hire black people or anything like that. But no one says that those are a prohibition on hiring, even if the person only wanted to, for example, hire a white person or hire a black person or whatever their discriminatory preference was. Nobody says that's a prohibition. And so it's a directly analogous context here where it's not a prohibition to ban abortion for a particular reason when the statutory provision directly protects the liberty to have an abortion in every other context. Your Honor. So in the state's view, could a woman just if, could she just change her mind? I mean, is that the alternative? If the doctor believed that it was for, that the woman wanted a pre-viability abortion because she got news that it was it, it had Down syndrome, the fetus had Down syndrome or tested that way. What if she just said, oh, no, I didn't mean that. I want it for another reason. Could she get that under the state's view? The state, the abortion provider to be subject to the statute would have to have actual knowledge that it was the sole reason. So if the patient said, I want it for some other reason, financial burdens, whatever that reason was, then the statute would not cover that by its plain terms. And Your Honor, I see that my time is mostly expired. If there's no further questions, I reserve the balance. You may. Counsel. May it please the court. I'm Claudia Hammerman for plaintiffs at police. We respectfully submit that the case before this court is straightforward and governed by binding precedent. The state of Missouri, in all five of these bands, has banned abortion at pre-viability points in pregnancy. And we submit that four decades of unbroken Supreme Court precedent make clear that this is unconstitutional. The state does not dispute and it is indisputable that each of these bands applies to pre-viability abortions. So the, indeed, Missouri already has a statute banning post-viability abortions. So the only conceivable point of these laws is to apply to pre-viability abortions. And Casey makes clear that the state may not do that no matter what interest it invokes. Casey held, quote, before viability, the state's interests are not strong enough to support a prohibition of abortion. And it categorically ruled that, quote, a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. And went on to make clear that viability marks the earliest point when a state may enact a legislative ban. So it does not matter whether the precise interests the state now invokes were considered in Casey or not. Casey established a categorical rule to guide lower courts, and that rule explicitly embraced any valid state interest. This court acknowledged as much less than five years ago in Edwards v. Beck and MKB management, concluding that unless the Supreme Court overturns its own precedent, lower and intermediate courts have no choice but to follow the Supreme Court's binding viability jurisprudence and strike down abortion bans that apply pre-viability regardless of whatever interests the state may assert. Counsel, I want to talk to you about the procedural posture here. We've got the grant of a preliminary injunction, and disagree with me if there's anything I'm saying that's wrong. My understanding is that Judge Saks originally declined to grant a preliminary injunction on the Down syndrome provision and later changed his mind. There was additional evidence presented and changed. Is that correct? Am I on the right track so far? That is correct. We argued that, in fact, he had overlooked certain evidence that had already been submitted, and we also submitted additional evidence. Okay, so here's my problem with the additional evidence, and I think it's a big problem for the grant of a preliminary injunction, not on gestational age, but with respect to Down syndrome. The statute says solely because of Down syndrome, and the evidence you have, or the evidence that I see in the record, and again, you can tell me if I'm wrong, the only evidence I see in the record is the evidence of a doctor who is in the clinic who says, I have done some Down syndrome abortions. That does not tell the district court or us how many of those women, those unknown women, those abortions were performed solely because of a Down syndrome diagnosis. In other words, it doesn't answer the question posed by the statute. And so I don't know how the district court could have possibly granted a preliminary injunction under a substantial optical test when the number of women was zero, the numerator and the denominator were zero. So help me understand how the district court could have possibly gotten there. Absolutely, Your Honor. And the district court concluded that the facts demonstrated a very high likelihood that without a preliminary injunction of the Down syndrome reason ban, a woman seeking a pre-viability abortion from the clinic would be denied access to the abortion if there was any knowledge that she had a Down syndrome diagnosis. But that doesn't tell me how many women, though. I mean, it doesn't tell me how many women would have been affected by the statute. That's the problem I'm having. Your Honor, if I may. Sure, I apologize. Oh, no, not at all. But if I may, I think Casey is clear that not a single woman can be denied or forbidden to have an abortion. The question of undue burden and large fraction test only comes in when you're talking about a regulation. Casey was at pains to make clear that its introduction  for regulations did not in any way limit the central holding of Roe that no woman could be prohibited from having an abortion pre-viability. And I would note that when this court reviewed pre-viability bans in both Edwards v. Beck and MKB management, it did not, it did not apply the undue burden standard. It did not... Well, I have two... Yeah, I have two questions with that. One is, I don't read the district court's opinion as taking that absolute approach you do. In fact, I think what the district court said in response to the question I asked, I mean, I didn't ask the district court this question, but he answered it, which is that he took judicial notice of what you were saying, in essence, which is that these women must have done it because of a Down syndrome diagnosis. They must have done it solely because of that. And I'm going to take judicial notice. I don't think as a matter of evidence that's particularly good, but he didn't accept. He didn't accept that this was a complete ban. And I'm not sure that it is because it's so narrow. I mean, it's narrow to specific instances. It's not a complete ban on abortions because of Down syndrome. It's a ban only insofar as it regulates, and I don't know what this is, regulates a specific set of women who want to have an abortion because of Down syndrome. So I'll give you a chance to respond. Thank you. Thank you. We think that this is a complete and entire ban. This will prohibit any woman who, in counseling, volunteers to her doctor that she is seeking an abortion because of a diagnosis of Down syndrome. That woman will be, that RHS will not serve that woman. And I think that the argument the state of Missouri appears to be making here is that RHS's doctors should risk their medical license over the question of whether the licensing authorities would conclude that where they were aware of a Down syndrome diagnosis, they still had no knowledge that it was the sole reason for the patient's abortion. Given the hostile climate towards abortion, and your honors can take judicial notice that the licensing authorities left RHS within one day of losing its license, if the courts had not intervened, given this hostile climate, the suggestion that doctors should risk such draconian penalties where they are aware of a Down syndrome diagnosis is just patently unreasonable and legally unsupportable. And courts have recognized that abortion providers... I want to just, I want to follow up because I want to put this in the data phase factors, which the district court applied, which is if we don't know based on the record that there's women who solely, that had an abortion solely because of a Down syndrome diagnosis, and I know you want us to take judicial notice and say yes, I mean like the district court did, but we don't have actual evidence, nothing in the record on that. What is the harm, I guess would be my point. So you have to balance whether or not there's going to be irreparable harm. And if there's no, if there's no evidence in the record that any woman has been or will be restricted because of this provision, what is the irreparable harm? We've got to identify somebody who's going to suffer irreparable harm. We think that there is clear irreparable harm. RHS and its doctors have taken the position that given the draconian risks that they face and the requirement that they certify that they do not have any knowledge, any knowledge, that Down syndrome is the sole reason that a woman is seeking an abortion. That given that, given that risk, they will not perform an abortion where they have any knowledge that there has been a diagnosis or indication of Down syndrome. So that necessarily means that any woman who approaches the clinic who either volunteers that she has had a Down syndrome diagnosis or if she was referred by a referral from a maternal fetal medicine practitioner who conveys the diagnosis or if her referring physician, the maternal fetal medicine physician or a genetic counselor conveys in her medical records that diagnosis, that woman will be deprived of an abortion. And as I was saying before, courts have been clear that when these kind of penalties are facing an abortion provider, an abortion provider is reasonable in steering clear of the danger zone. And we would also like to submit that we think that there was factual evidence before the court from plaintiff-appellee Dr. McNicholas that she has encountered patients who sought abortions based solely on and in part on Down syndrome. Now I want to ask you, I want to press you on that because I looked through everything that you cite for that in terms of the record and I did not find the solely because of. So if you could point me to a spot in the record where that's at, I would appreciate it. I will absolutely do that, Your Honor. It's in her first declaration and hopefully the folks with the real brains in the operation are sitting next to me and hopefully they'll retrieve that in just a moment and I'll point it to you. Thank you. But I do I do want to make note that this court has been clear that it is imminent irreparable harm does not require that an injury occur frequently or that it be immediately about to occur. In Richland-Wilkin Joint Powers Authority in 2016 826 F. 3rd 1030 this court made clear that quote, the alleged harm need not be certain to occur before a court may grant a preliminary injunction. I think what you're hypothesizing, Your Honor, is that our client and the doctors at the last remaining abortion clinic in Missouri should have to run the risk of losing their medical license because someone disagrees as to whether they had any knowledge that Down syndrome was the sole reason for a woman seeking an abortion. And we think that this is a completely inappropriate burden to put on these providers. We think it has an interim effect and it has. These providers have said that without a preliminary injunction they will not provide abortion care where they have any knowledge that there has been a Down syndrome diagnosis or a Down syndrome indication. And there would be nowhere else in Missouri for these women to go. How do we take that into account? I don't mean to be dominating the discussion, but how do we consider that? That probably, quite frankly, is enough to show Article 3 standing. I'm part of these doctors, right? And I've already talked to opposing counsel about third-party standing. In the First Amendment context, we allow a chilling effect, right? A chilling effect is something we take into account. But I'm not aware of any cases in the abortion context where a... And I know it's not voluntary, so I don't mean this in a voluntary sense. But when an abortion provider steers clear because they're scared of prosecution, because they want... There's a chilling effect. They need breathing space. How do we take that into account? Because in one sense, it is voluntary in the sense that they're saying, I don't want to run the risk, even if it doesn't violate the statute. And I don't know how to deal with that in the abortion context, and I'm not sure what cases help you there either. Your Honor, we would be happy to submit cases for Your Honor's consideration. And I did want to point you to the first McNicholas Declaration, which is Joint Appendix, page 115, paragraph 57. But I guess I want to emphasize that what the state is... The burden and the risk that the state would impose on these abortion practitioners is truly devastating. The license for this facility was almost not renewed, and the state found it was on a protectual basis. So the idea that in this environment, there would not be licensing issues brought against any doctor who performs an abortion where there has been a Down syndrome diagnosis, I just think that you can't blind yourselves to the reality of how this statute will play out. And the state here relies on Clapper. Well, Clapper, the argument was that this is a self-inflicted injury, that really, you were not in the danger zone, and so whatever precautions that you took that involved all kinds of expenditures, those were completely unreasonable. Well, Clapper, the plaintiffs there were not the target of the surveillance program. Plaintiffs here are the target. They are the abortion providers who would lose their license. And in Clapper, the risk that the plaintiffs' communications would be intercepted relied on what the court found to be a highly attenuated chain of five separate contingencies. Here, the statute  plaintiffs' appellees with severe sanctions. We do not think, to protect themselves, we think it is perfectly rational and reasonable for them to take the precautionary measures of not leaving to an unfriendly jurisdiction to determine an ineffable question of whether Down's Syndrome was the sole reason. Well, Down's Syndrome can come with added expenditures, and I think Mr. Sauer volunteered that, well, they could offer the issue of financial difficulties. Well, how does one parse that? Is financial difficulties, if the woman would have had the child and not had financial difficulties, if there had not been a Down's Syndrome diagnosis? But with the Down's Syndrome diagnosis, the cost of the medical condition and attending to that medical condition, the fact that she, that some Down's Syndrome children and adults require care into adulthood, so when financial issues come to bear, who is to say, I mean, it's really kind of, you know, epistemological issue as to whether is that but for the Down's Syndrome diagnosis that you have these financial issues, but for this Down's Syndrome diagnosis that you are now concerned that you won't be able to care for the children that you have? Your Honor, it's just unworkable, it is cruel, and it will deny women of Missouri the abortions that they seek, and it is clearly, clearly barred by Casey, and, you know, I think that Mr. Sauer argued that Casey, you know, that Supreme Court pronouncements should be interpreted as statutes. Well, Casey was very, very clear that it was making pronouncements to guide lower courts, and it was doing so, it was self-consciously adopting bright-line rules. It made clear that liberty should not be lost for the, ah, the first line of the opinion, liberty finds no refuge in the jurisprudence of doubt, liberty must not be extinguished for want of a line that is clear. And so it reaffirmed Roe's categorical viability line, stating a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. And that is not, I think, Mr. Sauer tried to argue that that is a conceptual pregnancy and not any particular pregnancy. Well, that's not what the language says. It's from making the ultimate decision to terminate her particular pregnancy before viability. That right belongs to a woman. And I think the reason for third-party standing, which was uniformly endorsed by June Medical, the reason for third-party standing in part is because a woman cannot get that abortion without a doctor who is willing to provide it. And here, the interim effects of the Down syndrome reason ban is such that if a doctor learns of a Down syndrome diagnosis, they will not, at the last remaining abortion clinic in Missouri, they will not provide the patient with an abortion. Counsel, I have one additional question subject to Judge Kelly's consent here. You know, I wanted to ask you a question you mentioned at the June Medical. And I just want to know, we held, not me, but our court held, in Hopkins v. Jiggly, that the Chief Justice Roberts' opinion, the plurality opinion at June Medical was binding, that that was, under the Marks rule, the case that governed. Does anything in the plurality, other than third-party standing, we've already discussed that, does anything in that concurring opinion change any of the arguments you're making? And if not, why not? On the merits. On the merits, Your Honor, we think, so putting aside third-party standing, we think that Justice Roberts' concurrence really does not address the question that is before this court, because what is before this court is a prohibition. And in fact, what was at issue in June Medical, all parties agreed, was a regulation subject to the undue burden standard. And in June Medical, Justice Roberts made clear that he was adhering to Casey, and was adhering to the basic holding of Casey, that the essential holding in Roe was being reaffirmed. And he had no reason to address the question of prohibitions because they just weren't there. But I guess we would argue that whether or not there's a balancing of benefits, first we would argue the undue burden test doesn't apply, didn't apply in NKV management, didn't apply in Edwards versus Beck, but even if it did apply, that we would meet that because this imposes an insurmountable obstacle in every situation where it is an actual restriction and not an irrelevant restriction. And thank you for giving me the answer. Thank you. Counsel? Mr. Sauer, do you have some rebuttal, I think? Yes, thank you, Your Honor. If I may, I'd like to address that last point first regarding June Medical. Here's what Chief Justice Roberts actually said in the June Medical opinion. So long as, considering a pre-viability abortion restriction, so long as the threshold showing is made, the threshold showing is whether there's a legitimate state interest and there's a rational, reasonable relationship to the regulation of its rational basis scrutiny, if the regulation passes rational basis scrutiny, quote, the only question for a court to consider is whether or not the regulation presents a substantial obstacle. That's what Chief Justice Roberts wrote in that opinion. It directly contradicts the main argument that they've made, both as to the gestational age restrictions and as to the down-signal provision, which is per se invalid. And that is, Chief Justice Roberts contradicts that. Now, they may say, well, look, there was no down-signal provision or gestational age restriction at issue in June Medical, so that's not controlling. Exactly the same is true of Casey and Rowe. So, either way, either it applies to both the opinions or neither of the opinions. Their argument is Casey decided this. Then Chief Justice Roberts, in an opinion for this court, as this court has recognized in Hopkins, an opinion of the court said, no, nothing is per se invalid. He says that the only question for a consort court to consider is the substantial obstacle test. That just directly contradicts the argument they've made, and to the extent that the court treats that as binding, it abrogates Edwards and MKB if they're to the contrary. And, of course, if the court gets to the substantial obstacle test and the associated large fraction test that's a corollary to that, there's been no evidence. No evidence of a large fraction was presented in this particular case. And I do want to address, very briefly, I can't leave unaddressed the statement that this provision is cruel, which Ms. Hammerman said late in her argument. I want to quote from paragraph 51 of the McCaffrey Declaration at page 526 of the Joint Appendix. He quotes from studies, specifically the Skokko study, reports that parents love at a rate of 99% and are proud of 97% their child with Down syndrome. About 80% said their outlook on life was more positive because they had a Down syndrome child. Brothers and sisters had a favorable perspective, nearly all reporting love and pride, 97% and 94%. Older siblings, that 88%, reported being a better person because of their brother and sister with Down syndrome. That is the loss that our society is confronted with that Missouri is addressing in this case. This is an incalculable loss of joy, beauty, and diversity that the epidemic of Down syndrome abortions following genetic screening threatens to impose on Missouri and our society as a whole, and Missouri's provision is a valid, constitutionally valid response to it. Your Honor, I see my time has expired unless there are further questions from the court. I'll step down. I see none. Thank you both for your arguments in this case, and we appreciate your willingness to appear by video. We will take the matter under advisement.